1  CHRISTOPHER CHIOU
   Acting United States Attorney
2  Nevada Bar No. 14853
   STEVEN W. MYHRE
3  Nevada Bar No. 9635
   DANIEL CLARKSON
4  Assistant United States Attorneys
   501 Las Vegas Boulevard South, Suite 1100
5  Las Vegas, Nevada 89101
   (702) 388-6336
6  Steven.Myhre@usdoj.gov
   Daniel.Clarkson@usdoj.gov
7  Attorneys for the United States

8

                    **UNITED STATES DISTRICT COURT**
9                        **DISTRICT OF NEVADA**

10  UNITED STATES OF AMERICA,

11                    Plaintiff,              No. 2:19-cr-00304-RFB-VCF

12        vs.                                **Government's Motion in Limine on
                                             Admissibility of Prior Acts as
13  LATONIA SMITH,                           Inextricably Intertwined Evidence or
                                             as Relevant Under Fed. R. Evid.
14                    Defendant.             404(b)**

15

16

17        The United States of America, by and through the undersigned, respectfully submits

18  the following Motion in Limine, seeking a preliminary ruling regarding the admissibility of

19  evidence regarding various acts committed by defendant Latonia Smith before and after the

20  conduct charged in the Indictment. This evidence is admissible because it is inextricably

21  intertwined with the charged conduct. Even if the Court finds that this evidence is subject to

22  Rule 404(b) of the Federal Rules of Evidence, it is admissible as proof of defendant's motive,

23  intent, knowledge, plan, and identity under Fed. R. Evid. 404(b). Further, the evidence is

24  more probative than prejudicial under Rule 403.

                                          1

Because this Motion seeks a potential ruling under Rule 404(b), it will also serve as formal notice of the government's intent to offer same at trial. Fed. R. Evid. 404(b)(2)(A).[1]

### FACTS

Defendant is charged with five counts of Mailing Threatening Communications in violation of 18 U.S.C. § 876(c). The victim alleged in Count One of the Indictment was the former supervisor of defendant's mother, a former employee of Planet Hollywood, which is owned by Caesars Entertainment ("Caesars"). The victims alleged in Counts Two through Five of the Indictment are attorneys and employees of a prominent Nevada law firm who were, in one form or another, associated with the defense of a civil action or actions arising from allegations of the wrongful termination of defendant's mother.

The government anticipates that the evidence at trial will show that the defendant became deeply involved in the litigation of her mother's civil action, to the point of interacting with the attorneys and staff defending the action. The threatening communications alleged in Counts One through Five of the Indictment were delivered through the mail and, as is usually the case, were made anonymously. Among other things, the government must prove at trial that the communications were not only made by the defendant but that they were transmitted for the purpose of issuing a threat, or with the knowledge that the communication would be viewed as a threat.

In this vein, the government will seek to introduce "other acts" evidence during its case in chief as further described below. As will be shown, these acts relate to communications made and actions taken by defendant that advance proof of her identity as

---

[1] The government is unable to comply at this time with the meet-and-conferment requirement for motions in limine set forth in LCR 12-2, given that it is currently unclear whether Defendant will be represented by counsel at trial or proceeding pro se.

the person making the charged threats, but also provide context and background for the charged acts and advance proof of the motive and intent behind the charged acts to show that they were transmitted for the purpose of issuing a threat, or with the knowledge that the communication would be viewed as a threat.

The "other acts" evidence at issue consists of the following.

1.    Communications Received by S.R.   Exhibits 1A through 1D contain Facebook messages and letters received by the victim alleged in Count One: S.R.  The government anticipates that at trial S.R. will testify that S.R. worked as a supervisor of defendant's mother at the Planet Hollywood.  The charge in Count One relates to a mailed communication that S.R. received in August 2018, which is depicted at Exhibit 2.  The charged communication was received *after* the communications received by S.R. in Exhibits 1A through 1D.

As is apparent from Exhibit 2, the charged threat contains not only the overt threat that "all will die," but also highly charged allegations that the targets of the threats are "racists" with undercurrent themes that the threat of death is motivated by racism, racial conflict, and retribution if the targets fail to "fix it." The communications contained at Exhibits 1A through 1D are similar in nature and advance proof as to defendant's identity and motivation behind the threat contained in Exhibit 2.

The government anticipates that the evidence will show that S.R. began receiving the similarly threatening Facebook postings, beginning in December 2017, about a month after the mother's termination. The postings purport to be from persons unknown to S.R., using the names Aus or Aussey Riley, Medina Sinclair, and Simone Wiley. Like Exhibit 2, the postings at Exhibits 1A through 1C contain themes of racism, racial animus, racial conflict and retribution.

S.R. also received two anonymous mailings in December 2017 and May 2018, respectively, attached as Exhibit 1D. These anonymous communications also include similar threats of retribution, accusations of racism, insults and profanity directed at S.R., and references to S.R. being a supervisor at work.

S.R. will testify that, while none of the account names of the purported Facebook posters are known to S.R., the communications included details about the mother's termination that were not generally known to others and bespeak of a relationship between the sender and the terminated employee.  Although S.R. cannot identify the sender of these communications, the government intends to offer evidence derived from defendant's personal cell phone showing that the "notes" section of the phone contains the unusual name of "Aus Riley" and what appears to be a corresponding password.  This would allow the jury to infer that the defendant sent the communications using the name "Aus Riley" or the derivation "Aussey Riley."  The jury may further infer that the defendant sent the communications based on the references to the employment and termination known to the defendant through her involvement in her mother's legal actions.

2.    March 21, 2019 Email from defendant Smith to Advanced Psychiatry Inc.  On or about March 21, 2019, the defendant sent an email to Advanced Psychiatry Inc. The email was extracted from defendant's personal cellphone that was recovered and searched pursuant to a Court-authorized Search Warrant and states as follows:

4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

*Advanced Psychiatry Inc.*
*4310 W. Cheyenne Ave.*
*North Las Vegas, Nv 89032*
*Phone: 702/763/7811*
*Fax: 702/947/4920*

On Thu, Mar 21, 2019 at 9:31 PM Latonia Smith <          @icloud.com> wrote:

Sent from my iPhone

As depicted, the email states that, at the time,

.[2] This communication *preceded* the

threatening communications charged in Counts Two (April 25, 2019), Three and Four

(September 30, 2019), and 5 (October 1, 2019) and during the time that the evidence will

show that the defendant was deeply involved with her mother's litigation and was interacting

with staff and lawyers defending the litigation. This communication (occurring a few weeks

[2] In an abundance of caution, the government has redacted the depiction of defendant's email to avoid any arguable disclosure of her mental health.  The government will file an unredacted version under seal.

5

before the charged threats) will be offered to advance proof of the criminal mindset behind the charged threats and that charged communications were transmitted for the purpose of issuing a threat, or with the knowledge that the communication would be viewed as a threat.

2.      April 17, 2019 Confrontation Between Defendant and S.P.  S.P. is the victim of the threatening communication charged in Count Three of the Indictment and an attorney with the law firm representing Caesars in the mother's employment action or actions, and who worked with attorney W.B. on the same matter.

The government intends to introduce testimony as well as video and audio evidence of a confrontation between the defendant and S.P. that occurred at the state courthouse in Las Vegas on April 17, 2019, a little more than a week before W.B., who worked with S.P., received an anonymous threatening communication by mail as charged in Count Two and about four months before S.P. received a threatening communication charged in Count Three.

The evidence of the April 17 confrontation will show that the defendant waited by the elevator bank for S.P. to exit the elevator, approached S.P., and threatened to punch S.P. This evidence will tend to prove defendant's identity as the person mailing the anonymous threat to S.P.'s co-worker about a week later and the threat to S.P. several months later.

3.      October 31, 2019 Confrontation between Defendant and W.B. and Related Communications.  W.B. is one of the victims of the threatening communication charged in Count Two. W.B. is employed by the same law firm as S.P. and was assigned to the civil actions involving defendant's mother. The government will offer evidence from the defendant's personal cellphone that, on October 31, 2019, defendant made multiple "hang-up" telephone calls to W.B. at W.B.'s law offices in Reno, where the caller hung up the telephone whenever W.B. answered the call.

On the night of October 31 (Halloween), W.B. answered a knock at the door of his personal residence in Reno, thinking the caller to be a trick-or-treater.  When he answered the door, he saw the defendant armed with what appeared to him to be a real firearm, but was later discovered to be a Glock replica BB gun. Reasonably fearing for his life, W.B. immediately and impulsively backed away from the door, tripping and falling to the floor in the process.

While W.B. was on the ground, the defendant stood over W.B., pointed the weapon at W.B., and spoke in a menacing and threatening manner, words to the effect of "we need to have a chat." A struggle ensued between W.B. and the defendant, during which W.B. fled the apartment and contacted police.

This event came after the receipt of the anonymous death threat to W.B. charged in Count Two which, among other things, stated "revenge is the sweetest joy and every single one of you will meet it *face to face* no one will be safe. . . ." (emphasis added).

4.       Defendant's Pro Se Filings.  After her indictment in this case and as is well-known to the Court, the defendant has made numerous pro se filings with the Court.  These filings have included violent threats, insults, and accusations of racism and call for revenge against several individuals, including some of the victims of the charged threats, law enforcement agents, and judges and attorneys involved in this case.

## LEGAL STANDARD

### A.       Inextricably Intertwined Evidence is Not Subject to Rule 404(b) Prior Acts Analysis

"[E]vidence should not be considered other crimes or other act evidence within the meaning of Rule 404(b) if the evidence concerning the other act and the evidence concerning the crime charged are inextricably intertwined." *United States v. Loftis*, 843 F.3d 1173, 1177 (9th Cir. 2016). In *United States v. Vizcarra-Martinez*, the Ninth Circuit explained:

> [W]e have allowed "other act" evidence to be admitted when it was necessary to do so in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime; it is obviously necessary in certain cases for the government to explain either the circumstances under which particular evidence was obtained or the events surrounding the commission of the crime. . . '[The jury] cannot be expected to make its decision in a void— without knowledge of the time, place, and circumstances of the acts which form the basis of the charge.'"

*Vizcarra-Martinez*, 66 F.3d 1006, 1012-13 (9th Cir. 1995) (citations and quotations omitted*); see also United States v. Soliman*, 813 F.2d 277, 279 (9th Cir. 1997) (evidence should not be treated as "other crimes" evidence under Rule 404(b) and may be admitted for all purposes when the evidence concerning the other act and the evidence concerning the crime charged are inextricably intertwined); *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1327 (9th Cir. 1992) (evidence used to flesh out the circumstances surrounding the crime with which the defendant has been charged, thereby allowing the jury to make sense of the testimony in its proper context, is inextricably intertwined and not subject to Rule 404(b)); *United States v. Butcher*, 926 F.2d 811, 816 (9th Cir.), cert. denied, 500 U.S. 959 (1991) (when a defendant is prosecuted for being a felon in possession of a firearm, evidence concerning other acts that are inextricably intertwined with the charged acts may be admitted).

**B.    Rule 404(b) Is A Rule of Inclusion, Not Exclusion.**

Even where evidence of prior acts is subject to Rule 404(b) analysis, this Circuit treats that rule as a rule of inclusion, not exclusion, and permits the admission of *any* evidence of other crimes or acts relevant to an issue in the trial, holding that such evidence should be excluded *only* when it proves nothing but the defendant's criminal disposition.  *See, e.g.*, *United States v. Diggs*, 649 F.2d 731, 737 (9th Cir. 1981); *United States v. Green*, 648 F.2d 587, 591 (9th Cir. 1981); *United States v. Rocha*, 553 F.2d 615, 616 (9th Cir. 1977); *see also United States v.*

*Simon*, 767 F.2d 524 (8th Cir. 1985) (Rule 404(b) is a rule of inclusion rather than exclusion). This "inclusionary rule," however, is subject to the balancing test of Rule 403.  *United States v. Sangrey*, 586 F.2d 1312, 1314 (9th Cir. 1978).

   "[A]ccordingly, '404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case.'"  *United States v. Jernigan*, 341 F.3d 1273, 1280 (10th Cir. 2003) (citation omitted).  "The threshold inquiry . . . is whether that evidence is probative of a material issue other than character."  *Huddleston v. United States*, 485 U.S. 681, 686 (1988).  The Ninth Circuit has held that evidence is admissible under Rule 404(b) if: (1) sufficient proof exists for the jury to find that the defendant committed the prior act; (2) the prior act was not too remote in time; and (3) the prior act is introduced to prove a material issue in the case.  *United States v. Ross*, 886 F.2d 264, 267 (9th Cir. 1989), *cert. denied*, 494 U.S. 1083 (1990); *United States v. Spillone*, 879 F.2d 514, 518-20 (9th Cir. 1989), *cert. denied*, 498 U.S. 878 (1990).  In addition, if used to prove intent, the prior act must be similar to the offense charged. *Id.* at 519.

   As for the October 31, 2019 confrontation with W.B., and Defendant's filings made after her indictment, Rule 404(b) permits evidence of acts committed both prior to and subsequent to the charged conduct. *See United States v. Bibo-Rodriguez*, 922 F.2d 1398, 1400 (9th Cir. 1991) (holding that "404(b) does not distinguish between 'prior' and 'subsequent' acts" and "subsequent act evidence may be considered under Rule 404(b)"); *see also United States v. Hinostroza*, 297 F.3d 924, 928 (9th Cir. 2002) ("[O]ur precedent has squarely resolved in the government's favor the issue that subsequent Rule 404(b) evidence may be relevant and admissible.").

**C.     Rule 403 Exclusion Requires Substantial and Unfair Prejudice**

Rule 403 only requires exclusion when the danger of unfair prejudice substantially outweighs the evidence's probative value. *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005) ("[U]nfairly prejudicial evidence is that having an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."). In addition, the Court can address any potential danger of unfair prejudice through the use of a limiting instruction. *United States v. Plancarte-Alvarez*, 366 F.3d 1058 (9th Cir. 2004) ("The disputed evidence had significant probative value while the danger of unfair prejudice was minimized by the court's limiting instruction."). "[T]he presence of a limiting instruction diminishes the danger of any unfair prejudice arising from the admission of other acts." *United States v. Franklin*, 250 F.3d 653, 659 (8th Cir. 2001). Reviewing courts are "reluctant to find that . . . evidence was unfairly prejudicial when the district court gave an appropriate limiting instruction." *United States v. Kent*, 531 F.3d 642, 651 (8th Cir. 2008).

## ARGUMENT

The evidence described above is inextricably intertwined with the offense conduct alleged in this case. Defendant is charged with mailing threats to her mother's former supervisor (Count One) and several employees of the law firm that was representing Caesars' in its civil legal actions involving defendant's mother (Counts Two through Five). The above evidence is necessary to "to offer a coherent and comprehensible story" regarding defendant's relationship to the victims and her interactions with those victims preceding the charged conduct. In addition, this evidence relates directly to "the events surrounding the commission of the crime" and is necessary to provide the jury with the "circumstances of the acts which form the basis of the charge." In other words, the threats charged in the Indictment were not received in a vacuum; they were part of an escalating course of hostile behavior by defendant

toward those she believed to be responsible for her mother's termination and for defending the civil actions arising from that termination.

Without this evidence, the jury would be left to wonder not only who sent the communications, but why to these victims and how these victims are connected to the defendant. This evidence also advances proof of mindset behind the communications, demonstrating that the threats are driven out of combination of a sense of revenge, racial animus, and hatred, showing that they are not a joke but intended to convey a threat. This is most poignantly demonstrated by the assault against W.B., which shows not only that defendant's threats intended bodily harm, but were real and capable of being acted upon.

The communications received by S.R. prior to the threatening mail charged in Count One relate to the same incident – defendant's mother's termination – that motivated defendant to commit the charged crimes. These communications themselves contain details indicating that defendant was the sender, and the government intends to introduce digital evidence at trial to confirm this. The confrontations between defendant and two attorneys at the firm defending Caesars – both of whom were also victims of the threatening mail charged in the indictment – are also integral to the jury's understanding of the events surrounding the charged conduct. The same is true of the defendant's email to Advanced Psychiatry, which relates directly to defendant's state of mind and motivation to commit the charged conduct.

Even if this Court were to find that Rule 404(b) applies to the above evidence, the evidence is admissible to prove defendant's motive, intent, plan, identity, and knowledge. All the above evidence relates to why defendant chose to send threatening mails to the victims. This evidence shows that defendant was enraged about her mother's termination, felt the termination was racist and unfair, and decided to resort to intimidation and threats as revenge for what she considered an "injustice."

11

In addition, the government anticipates that one of the disputes at trial will be the identity of the sender of the charged threats, which were sent by mail to the victims anonymously. Defendant's prior harassing and threatening communications to S.R., her hostile confrontations with both S.P. and W.B., and her email to a psychiatric institute describing her desire for revenge, are all highly probative of her identity as the sender of the charged threats.

The same is true of the *pro se* filings made by defendant after her indictment. As the Court is aware, defendant's numerous letters/pleadings in which she has described in detail her feelings of anger and hatred toward numerous individuals, including W.B., the victim of Count Two. These filings are similar to the charged threats and earlier communications made by defendant, in that they frequently contain accusations of racism, threats of harm and revenge, and statements that defendant believes that she has not, and cannot obtain, justice through the Court system and rule of law. The similarities between defendant's court filings – of which *she* is the author – and the charged threats make these filings probative and relevant to defendant's identity as the sender of the charged threats.[3]

None of the evidence described above contravenes Rule 403, which permits exclusion of evidence when the probative value is substantially outweighed by the danger of unfair prejudice. The probative value is extremely high, as it relates directly to the key issues of this case: proving that it was defendant who sent the threatening mail charged in the Indictment and explaining why she did so. No unfair prejudice would result from admission of this evidence.

---

[3] The government intends to introduce only a small number of these filings, to minimize any undue delay or cumulative evidence. The government's focus will be on filings that contain the similarities described herein.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**CONCLUSION**

WHEREFORE, for all the foregoing reasons, the government respectfully requests that the Court grant the government's Motion and rule the evidence described above as admissible for all the reasons stated herein.

**DATED** this 19th day of March, 2021.

Respectfully submitted,

CHRISTOPHER CHIOU
Acting United States Attorney

/s/ *Daniel Clarkson*
/s/ *Steven W. Myhre*

_____

STEVEN W. MYHRE
DANIEL CLARKSON
Assistant United States Attorneys
*Attorneys for the United States*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT 1

# Facebook Postings to S.R. Account

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT 1A

## "Medina Sinclair" Communications



# Medina Sinclair

You and Medina Sinclair aren't
connected on Facebook

12/7/17

9:00 PM

I have to say you fired my mom
in the most blatant
discriminatory act. My mom
works hard and loves her job.
She supports us kids at UNLV
and would never jeopardize her
job over a tip that you can't
even buy a Coke with. She
worked for the company for
more than 3 years with a clean
file and you fired her for no
reason except racial hatred.
She broke no policies, and you
did not have any ground to
suspend or fire her. Instead,

000007

She broke no policies, and you did not have any ground to suspend or fire her. Instead, you abused the handbook, used unrelated policies, and conspired with a supervisor who hates black people to rid a good employee of her job based also on your personal racial bias. There is proof that you singled her out and I hope your upper management shows you more mercy than you showed my mother because I am finding every action that can be taken against this wrongful termination and discriminatory act to ensure my mom gets her job back; I will not stop! Heartless and evil!

**000008**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT 1B

# "Aussey Riley" and "Aus Riley" Communications

3:24 PM                12/22/17

Wait I have an idea!! How about implement a tip policy and give a warning instead of firing minorities that you don't like. But then again that line of thinking is too deep for a dumb racist. Only a dumb racist would believe people steal 1 dollar bills when literally everything else in the hotel room is more valuable, including the toilet paper. Uneducated, racist prick. #hatewillnotwin #wewillresist

AND PASS ON TO RACIST FRIEN DS  #bunchofdumbasses

**000015**

19



# Aus Riley

You and Aus Riley aren't connected on Facebook



12/22/17

6:41 PM

And you're still a racist prick.
And all of your racist friends
that support you at work are
uneducated pricks and
puppets. Feel dumb yet after
firing minorities and using the
excuse that they stole $1?! No!
We just have dumb bigoted
leaders running this country
and running institutions, trying
to make decisions that they're
incapable of making. Decisions
like "hmmm why would my
loyal employees steal $1? Let
me implement a policy to
prevent miscommunications

000009

loyal employees steal $1? Let me implement a policy to prevent miscommunications with TIPS and give ALL employees a warning." NO! Your racist ego is the only thing that drives your thought processes because everyone else outside your little "Hitler" circle knows YOU ARE WRONG. Your ego and pathetic need for power won't let you admit that....sad. But to you and every other leader that wants to follow in your footsteps 👆 We won't tolerate hate and we'll make sure there's no place in our society for you animals. Probably a racist Trump supporter...pathetic.



000010

**Aus Riley**

S         R        is a racist who "tries" to ruin families. I'll continue to let it be known until something is done about it. At the place where she works several of the employees who she treats like crap ,because of their race, complain. I refuse to sit back and do nothing. I refuse to let people filled with bigotry and hate be our leaders in any way, shape, or form. I will continue to return the favor and let anyone associated with her know what a hate-filled person she is. We have racists invading our government and every part of our society. We're resisting. They are the problem! ✌

000011

and whether its ten years from now hopefully you do our society a favor and die by then, you will be held accountable for your actions and btw—no one actually likes you (well except your hitler group) #racists

1/12/18

Reported
this msg
1/12/18

Your coworkers now know what a racist you are via the team at linkedin. No safe space for racists



FRI 3:29 PM





000016

23

Just a pathetic, hateful, lonely loser. And a total racist. Middle finger to you, your racist friends at work, your piece of shit brother, and the piece of shit parents that raised a racist like you. Your father should have been a eunuch so we wouldn't have to deal with an asshole like you.



 GIPHY

Reply

000017



.12/18



# Aussey Riley

You and Aussey Riley aren't connected on Facebook

Studied at UC Berkeley

16:47

Your friend is still a racist. Maybe give her a pep talk and tell her to stop threatening housekeepers?! We have so much crap on her now it's hilarious. There are no safe spaces for racists now.



000028

1/12/18



# Aussey Riley

You and Aussey Riley aren't
connected on Facebook

Studied at UC Berkeley

4:16 PM



Racist just like your sister. Bunch
of pathetic losers we have to put
up with in this society.

000029

26



connected on Facebook

Studied at UC Berkeley

1/12/18

3:41 PM

do us a favor and
replace S
R        She is a racist
and no one in
housekeeping likes her.
Worse person to ever
do the job.



a total racist. There is
so much crap against
her, can't believe she's
still working. Shameful.



000030

1
2
3
4
5
6
7
8
9
10
11
12

# EXHIBIT 1C

## "Simone Wiley" Communications

13
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Simone Wiley

You and Simone Wiley aren't connected on Facebook

3/8/18

7:26 AM

Think you were forgotten about. you're very easy to find petty bitch...remember that.

We will get the last laugh 

s              r       who lives in                  . how's your new place? dumb bitch.

in life you only live because others allow you to

000012

# EXHIBIT 1D

## Mailings to S.R. of
## 12-20-2017 and 5-17-2018





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT 2

## Communication Charged in Count 1