CHRISTOPHER CHIOU
Acting United States Attorney
District of Nevada
STEVEN W. MYHRE
Nevada Bar No. 9635
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Steven.Myhre@usdoj.gov

*Representing the United States*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:19-CR-00304-RFB-VCF |
| Plaintiff, | |
| v. | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| LATONIA SMITH, | |
| Defendant. | |

**CERTIFICATION**:   The undersigned certifies that this pleading is timely filed.

Pursuant to LCR 32-1(d), the United States, by and through the undersigned, respectfully submits its Sentencing Memorandum in the above-captioned case.

## I.      Summary.

The government concurs with the United States Sentencing Guidelines ("USSG" or "Guidelines") Offense Level 24 as derived in the Revised Presentence Investigation Report ("PSR") (November 22, 2021) but further contends that the Court should apply a 3-level upward departure from the Guidelines to Offense Level 27.  The government further urges a custodial sentence of 87 months' imprisonment (vice the 60 months' recommended in the PSR), followed by 3 years' supervised release.

For the reasons set forth below, this sentence is significantly less than the statutory maximum authorized for the violent conduct embraced by the charges in this case and, "as a whole," is sufficient, justified and warranted when considering the sentencing factors contained in Title 18, United States Code, Section 3553(a).

In addition to addressing the PSR's Guidelines calculation and the 3553(a) sentencing factors, this Memorandum will also address the government's position regarding the defendant's unresolved objections and will provide justification for an upward departure from Offense Level 24.

## II.    Facts.

### A.    Procedural Posture.

The procedural posture of the case is accurately recounted in the PSR. The defendant was charged by Indictment with five counts of Mailing Threatening Communications in violation of 18 U.S.C. § 876(c) in November 2019. Each violation of this statute carried a statutory maximum sentence of five years' imprisonment.

The defendant was arrested on November 1, 2019, and has been, ever since, detained. Her case was tried to a jury commencing on April 22, 2021. ECF No. 215. The jury returned a verdict of guilty on all counts in the Indictment on April 29, 2021. ECF No. 234.  Accordingly, the defendant faces a statutory maximum sentence of 25 years' imprisonment.

Sentencing of this matter was set for December 16, 2021. The Probation Office submitted a revised Presentence Investigation Report ("PSR") of November 22, 2021, which, among other things, recommended a custodial sentence of 60 months' imprisonment to run concurrently on each count as consistent with a Total Offense Level

2

of 24 under the Guidelines.  The defendant filed a Sentencing Memorandum on November 30, 2022 (ECF No. 262), raising objections to the PSR and recommending a custodial sentence of "time served."

The government now files its Sentencing Memorandum, responding to the defendant's objections to the PSR and recommending a custodial sentence of 87 months' imprisonment.

**B.      The Nature and Circumstances of the Offense Conduct and the Characteristics of the Defendant.**

This case involved egregious violent and premeditated criminal conduct that escalated over time and caused substantial and severe emotional and physical injury to the victims of these crimes. Having presided over the trial and extensive pretrial litigation of this case, the Court is very familiar with the facts and, thus, they need not be recounted in detail here except summarily, and in pertinent part, as follows below.

The five communications charged in the Indictment included graphic and detailed death threats and other threats of bodily injury and harm. The communications themselves, as well as the address labels on the envelopes, were type-written and sent anonymously from Las Vegas via U.S. mail. The facts adduced at trial proved that the defendant mailed these communications with the intent to communicate a true threat and with the knowledge that these communications would be viewed as true threats by the victim-recipients.

As the trial evidence showed, the victim-recipients of these threats were individuals connected in some way either to the termination of the defendant's mother's

3

employment, or to the law firm that represented the mother's former employer in the civil actions that followed the termination.

> ### 1.   *Termination of Defendant's Mother's Employment – Initiation of Threatening Communications to Samantha Radak from Anonymous Sources*

The trial evidence showed that in 2017, the defendant's mother, Annecer Peruzar, was employed as a Guest Room Attendant at the Planet Hollywood Casino, which is owned and operated by Caesars Entertainment (referred to collectively herein as "Caesars"). Samantha Radak (the victim alleged in Count One) was Peruzar's supervisor until approximately November 2017, when Caesars terminated Peruzar's employment.

Thereafter, and beginning in December 2017, Radak began receiving a series of harassing and threatening messages through Facebook that are further detailed below at Section IV.C. In March 2018, Radak received a Facebook message from "Simone Wiley," which stated: "Think you were forgotten about. you're very easy to find petty bitch…remember that. We will get the last laugh." The message also referenced the specific housing community where Radak lived.

> ### 2.   *Initiation of Civil Litigation Against Defendant – Threatening Letter to Radak – Defendant Becomes Involved In Her Mother's Litigation – Escalation of Hostility*

Following the March Facebook posting and after developing evidence that the messages originated with Peruzar's daughter, Radak and Caesars sued the defendant, retaining Attorney Brenoch Wirthlin of the firm of Fennemore Craig to prosecute the claim. Radak (through Mr. Wirthlin) filed an application for a Temporary Protection Order ("TPO") against the defendant. This lawsuit eventually settled with the defendant

not admitting to liability but nonetheless agreeing not to send any further communications to Radak or Caesars.

The threatening communications ceased for a brief time thereafter but then resumed later. In May 2018, Radak received an anonymous note sent to her home, which stated:

> You and the racist managers who protect you leave and we will stop we will not stop until racists are out of our workplaces and society.

The word "RACIST" was repeated in large capital letters.

In August 2018, Radak received the anonymous letter that was charged in Count One. The letter was sent to her home and did not include any signature or other identification of the sender. This letter included the following statements: "You have lived sevenn months pass the new year / Yoouu do not deserve the air you breathe"; "Seek penance fix your ways and actions or you will all die / ALL"; "No one is untouchable"; "ALL WILL REGRET / REAL THREAT / FIX IT"; "Deadline Monday December 31, 2018:  YOU BETTER FIX IT."

On November 5, 2018, the defendant's mother sued Caesars, alleging various civil claims arising out of her employment termination. The trial evidence showed that at times relevant to the Indictment, Wade Beavers was an associate attorney employed by the Fennemore Craig law firm in Reno, Nevada. The Fennemore firm was hired to represent Caesars in the Peruzar lawsuit.

The Peruzar suit alleged a host of claims arising from the termination of Ms. Peruzar's employment with Planet Hollywood. Beavers and his assistant, Shawna Braselton (the other victim alleged in Count Two), were assigned to work on the Caesars litigation

along with Shannon Pierce, a Fennemore partner. Pierce, Beavers, and Braselton would become known to the defendant through the pleadings filed in the civil litigation.

The trial testimony of Shannon Pierce and Wade Beavers showed that the defendant became deeply involved in her mother's lawsuit against Caesars. Although the defendant was not a lawyer and did not (and could not) legally represent her mother, the Fennemore lawyers believed she nonetheless sent correspondence and filed pleadings on behalf of her mother in connection with the litigation.

Additionally, the defendant was often present for proceedings related to her mother's lawsuit. Pierce testified that following one such proceeding in April 2019, the defendant confronted, and physically threatened, Pierce and a Caesars' representative as they were leaving the courthouse in Las Vegas. This event is recounted more fully below at Section IV.B.2 below.

Not long after the courthouse confrontation and in late April 2019, Beavers and Braselton received an anonymous threatening letter addressed to them at Fennemore's Reno office. This letter was charged in Count Two of the Indictment and was referred to at trial as the "hit list" letter. That letter stated among other things that the recipients had been "added to the hit list" and that "revenge is the sweetest joy and every single one of you will meet *it face to face.*"  Government Exhibit 5 (emphasis added).

The "hit list" letter prompted Wade Beavers and Shawna Braselton (the recipients) to apply in Nevada state court in Reno for a TPO against the defendant in April 2019. The TPO application resulted in a hearing in June 2019, which the defendant, Beavers, Braselton, and others from the Fennemore firm, attended.

6

### 3.    The "Slit Your Throat" Letter.

In May 2019, the defendant filed a civil complaint in federal court against the Fennemore firm, asserting claims that certain Fennemore attorneys were retaliating and conspiring against her. In connection with that litigation, the defendant attempted to take the depositions of Beavers and Pierce and other Fennemore attorneys. On September 25, 2019, United States Magistrate Judge Youchah held a hearing in the defendant's Fennemore action and ruled against the taking of the depositions.

Data seized from the defendant's Smartphone showed that on the same date of that adverse ruling, the defendant authored the threatening letter that is charged in Counts Three through Five of the Indictment. This letter – referred to at trial as the "slit your throat" letter – was sent to Fennemore attorneys Pierce and Tyre Gray (an associate of the firm who had accompanied Pierce to meeting with Peruzar), and also to Jean Wirthlin, the wife of Fennemore attorney, Brenoch Wirthlin. Each letter was addressed individually to the recipients at different locations: Pierce (Fennemore's Reno Office); Gray (Fennemore's Las Vegas Office), and J. Wirthlin. (her home in Las Vegas).

The letter caused great fear, concern and consternation to the recipients and to management at the Fennemore firm, as it threatened, among other things, as follows: "your throat will be slit you will be recorded as the blood spills from your neck and just as you gasp to take your final undeserving breath *three bullets will be placed right through your skull . . . when you least expect it you will beg for your lives* and your children's lives . . . the marks of your dried tears will be left *with your bloodied brain splattered across the floor . . . .*" Government Exhibits 8,12 and 15 (emphasis added).

7

### 4.       *Defendant's Assault with a Dangerous Weapon on Beavers*

Around 7 p.m. on Halloween evening, October 31, 2019, the defendant showed up at Beavers' apartment complex in Reno where she physically and violently assaulted him with what he observed and believed was a firearm but was, most likely, a replica Glock .45 BB-gun. This heinous event is recounted in further detail below in Section IV.B.4 below.

After the assault, the defendant fled Beavers' apartment and drove back to Las Vegas, returning to her mother's house where she resided. In the evening of November 1, 2019, she was arrested pursuant a warrant issued from a federal complaint alleging communicating a threat by mail. A duly authorized search warrant was contemporaneously executed at the mother's residence, pursuant to which law enforcement authorities recovered from the defendant's bedroom, among other things, a black BB-gun that was modeled to replicate a Glock .45 semi-automatic handgun, along with handwritten driving directions from Las Vegas to Beavers' apartment in Reno.

This evidence, including the violent assault on Mr. Beavers, was suppressed by the Court in pretrial litigation on the basis that it was not relevant to the charged threats.  It is offered here, however, in connection with adjudging an appropriate sentence for the offense conduct and may be properly considered in sentencing.

### 5.       *Relationships Between Victims and Defendant – Nature of the Communications*

This section recaps and summarizes the context and characteristics of the prior relationships between the victims and the defendant, the nature and character of the

threatening communications, and the commonality and differences of the victims who received them.

Radak, Gray, and the Wirthlins lived in Las Vegas, the same city as the defendant. Beavers, Braselton and Pierce, however, all resided in Reno. With the exception of Pierce and Gray, the victims had no antecedent personal interaction with the defendant and *none* of them, including Pierce and Gray, had any antecedent interaction or communication with the defendant that could, in any way, be construed as provocative.  Pierce's personal interaction with the defendant was limited to greetings at hearings and an unprovoked and uninvited confrontation as discussed further below.  Any antecedent interaction with Braselton and Beavers was limited to their names appearing on pleadings or in correspondence arising from the civil litigation with the defendant's mother.

As a result of the threats, Radak, Beavers, Braselton, and Pierce obtained at least three (3) court orders (TPOs) against the defendant civilly restraining her from interacting or communicating with them – the TPOs issuing from courts in Las Vegas and Reno. In the case of Beavers and Braselton, the defendant attended and was the object of a civil hearing in connection with the TPO where her victims presented evidence of the threats made against them and where she heard and saw the impact these communications had upon them.

The defendant's reaction to the TPO's was to level false accusations against her victims, claiming either that she did not author the threats or that she, herself, was the object of threats made against her. At a civil judicial hearing in Las Vegas in connection with a TPO, a judge found her to be not credible in connection with the imagined

accusations she made against her victims.  At a hearing before a federal magistrate judge, the judge found the defendant's accusations against her victims were neither credible nor worthy of discovery. The defendant's response to these findings was to lash out at the judges who made them, hurling racial epithets and making scandalous accusations against them. *See* ECF No. 56.

Trial evidence showed that the mailed communications charged in Count Two contained graphic and unambiguous language that had escalated in tone and tenor from the earlier threat leveled at Radak. The anonymous mailings to Tyre Gray, Shannon Pierce, and Jean Wirthlin – which chronologically followed the mailing sent to Beavers and Braselton – were likewise graphic but the violent nature of the threat language had escalated even further from a general "hit list" to the specific "slit your throat" and "three bullets in your head." Significantly, the slit your throat letters were mailed well *after* civil TPOs had issued against the defendant.

The escalating language of the threats were, on their face, not only menacing, frightening and graphic, but left little doubt in any reasonable person's mind about the intent behind them. The mailing received by Pierce contained an additional message to the "slit your throat" language found on a smaller piece of paper affixed to the envelope, which included the words: "thee shall kicketh the bucket first aft'r thou art curs'd . . ."

At trial, the Court heard the testimony of each of these victims and saw their emotions as they recounted their fear upon receiving these threats. By their verdict, the jury obviously found their compelling testimony to be credible and the threats – true.

10

6.  ***Defendant's Arrest and the Search of Her Residence – Evidence Seized in the Subsequent Search – Extracted Data from Smartphone***

On November 1, 2019, and following the Beavers aggravated assault detailed below, the defendant was arrested at her residence in Las Vegas pursuant to an arrest warrant. Law enforcement officers contemporaneously searched her residence pursuant to a duly authorized search warrant where among other things the officers seized a replica Glock .45 BB-gun and the defendant's Smartphone.

A subsequent forensic analysis of the phone revealed data that demonstrated the defendant's criminal activities as described herein and corroborated the threats. The data was extracted from the telephone forensically and the government offered most of this evidence at trial where much of it was subsequently admitted for jury consideration.

## III.   Legal Standard.

Proper sentencing procedure requires that, before imposing sentence, the district court: (1) correctly calculate the Sentencing Guidelines range; (2) treat the Guidelines as advisory; (3) consider the 18 U.S.C. § 3553(a) factors; (4) choose a sentence that is *not* based on clearly erroneous facts; (5) adequately explain the sentence; and (6) not presume that the Guidelines range is reasonable.  *United States v. Carty*, 520 F.3d 984, 991-93 (9th Cir. 2008).  When the court imposes a sentence within the Guidelines range, "'it is probable that the sentence is reasonable'" because the court's application of the Section 3553(a) factors accords with the Sentencing Commission's independent application of those factors in the "mine run of cases." *United States v. Blinkinsop*, 606 F.3d 1110, 1116 (9th Cir. 2010) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)).

11

It would constitute procedural error, however, for the court to "attach [ ] a presumption of reasonableness to the Guidelines range or weight[ ] the Guidelines range more heavily than other § 3553(a) factors." *Carty*, 520 F.3d at 994. The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also consider the § 3553(a) factors "in determining the appropriate sentence." *Nelson v. United States*, 550 U.S. 350, 352 (2009).

**Objections to Presentence Report**.

Under Rule 32, Federal Rules of Criminal Procedure, the Court may accept any undisputed portion of the PSR as a finding of fact for the purpose of imposing sentence. Fed. R. Crim. P. 32(i)(3)(A). For any disputed portion of the PSR, the Court must rule on the dispute or determine that a ruling is unnecessary either because it will not affect the sentence or because the Court will not consider it when imposing sentence. Fed. R. Crim. P. 32(i)(3)(B). Only specific factual objections trigger the requirements of Rule 32(i)(3)(B). *United States v. Petri*, 731 F.3d 833, 841 (9th Cir. 2013). A specific factual objection addresses a factual inaccuracy; it does not merely object to recommendations, opinions, or conclusions. *Id.* (citations omitted).

There is no limitation to the information the Court can consider in sentencing, including information unrelated to the count of conviction. 18 U.S.C. Section 3661; *United States v. Vitrano*, 495 F.3d 387 (7th Cir. 2007) (relevant conduct in Section 1B1.3 of Sentencing Guidelines limits the conduct that can be considered in setting the range, but once that range is determined the judge's ability to choose the sentence is not so limited). The rules of evidence do not apply at a Rule 32 Sentencing Hearing and a "sentencing judge

has broad discretion to hear a variety of evidence normally inadmissible during trial." *United States v. Hopper,* 27 F.3d 378, 382 (9th Cir. 1994) (internal quotations and citations omitted).

As a general rule, the party seeking to adjust an offense level must establish that the adjustment is merited by a preponderance of the evidence, but the burden increases to clear and convincing if the adjustment will have disproportionate impact on the ultimate sentence imposed. *United States v. Johansson,* 249 F.3d 848, 857 (9th Cir. 2001) (finding four level increase for fraud of offense not disproportionate to the offense of conviction).

## IV.   The PSR Derived the Appropriate Guidelines Offense Level for the Offense Conduct and Criminal History Category.

The government concurs with the PSR's derivation of Total Offense Level 24 (after adjusting for specific offense characteristics and multiple counts of conviction) for the offense conduct. The Guidelines range for offense level 24 is 57 to 63 months' imprisonment. The government further agrees that the defendant has no significant criminal history and that a fine should not be imposed.

For the reasons set forth below, however, the government recommends the imposition of 87 months' imprisonment based either on a 3-level upward departure from the Guidelines or on the sentencing factors under Section 3553(a) or on both.  The defendant's objections to the PSR's offense level calculation, the government's responses thereto, and its justification for an upward departure are addressed as follows.

### A.   Facts Pertinent to Specific Offense Characteristics.

The government does not object to the facts as recounted in the PSR but submits that they are not comprehensive for sentencing purposes -- and reasonably and

understandably so.  The U.S. Probation Officer's investigation and the PSR was limited to reports generated during the investigation of this case.

The Court is not so limited, however. Having heard the evidence presented at trial and at pretrial proceedings, the Court may, in addition to the uncontested facts in the PSR, properly adopt the facts contained herein in support of an 87-month custodial sentence as these facts are fully supported by record evidence in this case as well as by the jury's guilty finding on the essential elements of the charged offenses.

### B. A 6-Level Adjustment under Section 2A6.1(b)(1) Is Warranted for Conduct Evidencing An Intent to Carry Out the Threats.

The parties do not dispute that the base offense level for the offense conduct is 12. USSG 2A6.1(a)(1).  The PSR concludes, and the government concurs, that a 6-level adjustment to the Base Offense level under Section 2A6.1(b)(1) is warranted for the specific offense characteristic of conduct "evidencing an intent to carry out such threat." USSG Section 2A.6.1(b)(1).  The defendant objects to the adjustment, contending that there was no evidence of such conduct and that "the communications were made without any prior indication, forewarning, or communication or interaction with any of the victims." Def. Mem. at 5.

Defendant is wrong. Aside from the unambiguous language contained in the threats themselves, which alone betrays the intent behind the words, the government introduced oodles of context evidence which showed not only that the defendant was the author of the threats but that she intended to act out on them as well. In this regard, the government relies on the entire record of trial but briefly summarizes some of the more salient evidence on this point as follows.

14

1.   **Government Exhibit 93**.  <u>March 21, 2019, Email from defendant Smith to Advanced Psychiatry Inc.</u>

As revealed by the data extracted from her seized Smartphone, the defendant sent an email to Advanced Psychiatry Inc. in or about March 21, 2019. This email, admitted at trial as Government Exhibit 93, expressly stated that the defendant was entertaining the thought of killing those who were involved in the events surrounding her mother's firing and the subsequent employment litigation.

---

Advanced Psychiatry Inc.
4310 W. Cheyenne Ave.
North Las Vegas, Nv 89032
Phone: 702/763/7811
Fax: 702/947/4920

On Thu, Mar 21, 2019 at 9:31 PM Latonia Smith <<u>lds11a@icloud.com</u>> wrote:

Hi, last year an injustice occurred to my mother. I dealt with suicidal thoughts before but since then I've been having thoughts of murdering a hit list of people who are involved if justice is not served through the court system. Mostly a bunch of rich people or people with power that think they're untouchable. I am aware of my thoughts and I know they are not particularly good thoughts, which is why I'm reaching out. I don't know what will happen if my family is ignored by the courts. I might carry out my plan to kill all of those who tried to destroy us. I guess it will put the power back into my hands and show people that no matter who they are they're only living because someone else is allowing them to. I don't know I have a pretty normal life, I've been pretty successful so far, but I don't think that will outweigh my need to see justice served.

Sent from my iPhone

---

As shown above, the email stated that, at that time, the defendant was having thoughts of murdering people involved in the "injustice" that occurred to her mother, and that she might carry out her plan if her family was ignored by the courts. This

communication closely *preceded* the threatening communications to kill as charged in Counts Two (April 25, 2019), Three and Four (September 30, 2019), and Five (October 1, 2019). The email occurred at a time during which the time that the defendant was deeply involved with her mother's litigation and was interacting with staff and lawyers defending the litigation.

This communication (occurring a few weeks before the respectively charged threats) was offered and admitted at trial to advance proof of the criminal intent behind the threats and to show that the defendant transmitted the offending communications for the purpose of making a true (i.e. real) threat with the knowledge that the communications would be viewed by her victims as a real threat. This email is, therefore, direct evidence of the inner workings of the defendant's mind and shows that the charged threats were not mere puffery or a product of emotional pique, but were serious expressions of her criminal mindset to act upon them.

2.     **Government Exhibits 22 and 24.**   April 17, 2019, Confrontation Between Defendant and Shannon Pierce at the Clark County Justice Center.

As recounted above, Shannon Pierce was the victim of the threatening communication charged in Count Three of the Indictment.  Ms. Pierce testified at trial about the physical confrontation that occurred between her and the defendant at the state courthouse in Las Vegas on April 17, 2019, a little more than a week before Wade Beavers and Shawna Braselton received the threatening communication charged in Count Two and about four months before Ms. Pierce received the threatening communication charged in Count Three. Through Ms. Pierce, the government also introduced Government Exhibits 22

16

and 24 which contained video recordings from a surveillance camera that captured images from the confrontation.

The video and testimonial evidence showed that following a hearing on her mother's civil employment case, the defendant waited by the elevator bank on the first floor of the Las Vegas state courthouse. When Ms. Pierce, and a colleague who was with her, left the elevator and proceeded down the hall to leave the courthouse, the defendant approached her in a menacing way, blocked her path, and threatened to punch Ms. Pearce in the mouth. The images from the surveillance video showed that the confrontation impeded Ms. Pierce's path to exit the courthouse and that the confrontation was stopped only when the defendant's mother intervened, grabbed the defendant by the arm, and moved her away from Ms. Pierce.

The confrontation was not only physically threatening at the time it occurred but had a lasting effect on Ms. Pierce who testified that she greatly feared for her physical safety thereafter.  It also left no doubt in her mind that the threats she received "anonymously" through the mail three months later were, in fact, from the defendant and that the threats communicated a clear intent and capability to act out and do bodily harm to Ms. Pierce in the future.

### 3.   The Escalating Violent Nature of the Language Used in the Threats.

It was not long after the courthouse confrontation that the language of the threats escalated further. In late April 2019, Wade Beavers and Shawna Brazelton received "the hit list" letter discussed above. The language of that letter was unambiguous as to the violent intent behind the threats to kill or injure: "congratulations you've been added to the hit list" and that "revenge is the sweetest joy and every single one of you will meet *it*

17

*face to face.*"  Government Exhibit 5 (emphasis added).  Knowing of the preceding courthouse confrontation that involved one of their colleagues, these unambiguous communications confirmed for these victims that the defendant was willing, able, and capable of acting out on her stated intent to kill or injure.

In May 2019, the defendant's actions further escalated by the filing of a civil complaint in federal court against the Fennemore firm, asserting claims that certain Fennemore attorneys were retaliating and conspiring against her. In connection with that litigation, the defendant attempted to take the depositions of Wade Beavers and Shannon Pierce, and other Fennemore attorneys. On September 25, 2019, United States Magistrate Judge Youchah held a hearing in the defendant's Fennemore action and ruled against the taking of the depositions.

The threats continued to escalate thereafter. As discussed above, the data seized from the defendant's smartphone showed that on the same date of that adverse ruling, the defendant authored the "slit your throat" letter, the escalating graphic *and detailed* language of the threats. Government Exhibits 8,12 and 15 (emphasis added).

### 4.    Defendant's Assault with a Dangerous Weapon on Wade Beavers.

Any doubt about the defendant's intent to carry out her threats to kill or injure her victims was erased by the aggravated assault with a dangerous weapon on Wade Beavers. This evidence is offered here in support of the enhancement under Section 2A6.1 and – because a dangerous weapon was used in the assault – it is also offered in support of an upward departure from the Guidelines as discussed in more detail below.

The following facts are derived from pretrial pleadings in this case. See ECF No.'s 165, 187 and 203.  After dark and around 7 p.m. on Halloween evening, October 31,

2019, the defendant showed up at Wade Beaver's apartment complex in Reno, having rented a car in Las Vegas and the driving it several hundred miles from Las Vegas to Reno that same day. She went to his apartment unannounced and rang the doorbell. Thinking he was being visited by "trick or treaters," Beavers opened the door only to find the defendant standing there.

Instantly recognizing her from the June 2019 TPO hearing, he became fearful and shouted words to the effect of "oh no!" or "no, no!" and attempted to close the door as he tried to move back from the entrance. The defendant advanced toward him through the door as he backed away, causing him to fall to the ground and dislocate his shoulder. He saw the defendant standing over him pointing a black handgun at him and saying words to the effect of "we need to have a chat."

In pain from his dislocated shoulder, Beavers attempted to wrest the gun away from the defendant, eventually making his way back to his feet as he struggled with her for the gun. During the struggle, he was able to maneuver to the open door and made his escape from the defendant, running from the apartment and frantically knocking on doors to find a neighbor to help him contact the police.

Upon learning of the incident, authorities at the Fennemore firm, concerned for the safety of their employees, notified the recipients of the "slit your throat" letter (Pierce, Wirthlin, and Gray), of the attack on Beavers and, among other things, offered to assist with relocating them to hotels or other temporary lodging as a means of protection until the defendant could be apprehended. The threatening language of the "slit your throat" letter took on greater meaning for these victims after learning of the attack on Beavers and

caused them to become even more fearful that the threats were real and that the defendant was not only capable of acting out on them but, in fact, acted out on them.

After the assault, the defendant left the apartment and drove back to Las Vegas, returning to her mother's house where she resided. In the evening of November 1, 2019, she was arrested pursuant a warrant issued from a federal complaint alleging communicating a threat by mail. Pursuant to a warrant authorizing the search of her mother's residence, law enforcement authorities recovered from the defendant's bedroom, among other things, a black BB-gun that was modeled to replicate a Glock .45 semi-automatic handgun, along with handwritten driving directions from Las Vegas to Mr. Beaver's apartment in Reno.

In a pretrial ruling, and over objection by the government, the Court excluded this evidence at trial on the merits of the case as irrelevant. The Court may, however, appropriately consider the evidence now, for the purposes of adjudicating a sentence as it is directly relevant to defendant's intent to carry out her threats to kill or injure.

The Beavers assault was consistent with the threat language contained in the "hit list" letter: which references "a hit" and a "*face to face*" meeting where "no one will be safe. . . . ." (emphasis added). The assault is also consistent with the "slit your throat" letter which specifically stated: "as you gasp to take your final underserving breath *three bullets will be placed right through your skull.*" (emphasis added).

Defendant claims that the evidence of the Beaver's assault cannot be considered for a Section 2A6.1 enhancement because the assault occurred "more than six months after the communication was received by [Beavers]" and the defendant came to the apartment "armed with a fake gun incapable of inflicting harm on anyone." Def. Mem. at 5. Here, again, the defendant is wrong.

20

As to the weapon, whatever its actual capabilities, it reasonably appeared to be a firearm to the victim at the time and under the circumstance in which it was used. Indeed, the BB-gun seized from the defendant's residence was manufactured to replicate a Glock .45 and the defendant pointed it directly at Beavers when Beavers saw her. When all this happened, she didn't say: "No worries – this gun doesn't shoot real bullets." Instead, she said menacingly: "We need to have a chat."

Moreover, while the gun was indeed a BB-gun, it was not by any stretch either "fake" or "incapable of inflicting harm." A barrel that expels a small metal bearing at high velocity by the force of a rapid discharge of CO-2 is, by any legal definition, a dangerous weapon, and in practical use, capable of causing serious injury and even death under the right circumstances. *See* Guidelines Section 1B1.1, note 1 (definition of dangerous weapon under the Guidelines). Thus, at the very least, the defendant created the circumstances where Mr. Beavers would reasonably fear imminent death or bodily injury all of which manifested the defendant's stated intent to put "a hit" on Beavers and kill or injure him.

More to the point, however, her assault caused actual physical injury – a dislocated shoulder – from which the victim continues to suffer pain to this day. *See* Wade Beavers Victim Impact Statement. Accordingly, the assault not only evidenced her intent to cause injury but caused actual physical injury as threatened.

As to the timing of the assault, the defendant offers no argument or authority as to why the assault cannot be considered for this enhancement based on timing. And the government cannot divine any.

There is nothing in the Guidelines that precludes the Court from considering conduct that occurred "six months after the communication was received." Def. Mem. at 5.

21

Further, we simply do not live in a world where the meaning and intent of words is not

derived from conduct that occurs after they are uttered.  Here, the jury found that the

defendant's threats were "true threats;" that is, communications that the sender and receiver

understood or believed to be understood or perceived as a threat to injure the receiver of the

communication. ECF No. 232 at 6 (Jury Instruction on True Threat). The assault occurred

**during** the time the victims rightfully perceived her threats as "true." Accordingly, the

enhancement applies.

### C.    A 2-Level Adjustment Under Section 2A6.1(b) for More Than Two Threats.

Defendant objected to the application of a Section 2A6.1(b) adjustment,

claiming no facts supported it.  The defendant's argument has no support in the record.

The following facts are derived from evidence adduced at trial and show that a 2-

level enhancement for more than two threats is warranted. Government Exhibits 1A

through 1D contained Facebook messages and letters received by Samantha Radak, all

of which contained threatening communications.  These were admitted at trial to prove

the defendant's authorship of the threatening communication charged in Count One.

At trial, Ms. Radak testified that in December 2017, and after terminating the

employment of Ms. Peruzar, she began receiving a series of harassing and threatening

messages through Facebook. These messages were sent from three different Facebook

accounts identified with the following names: "Medina Sinclair," "Aussey Riley" or

"Aus Riley," and "Simone Wiley." Radak did not recognize any of these names but the

the content of these messages revealed  that they were sent by someone upset about

Peruzar's termination and familiar with the details of that termination.

22

- December 2017: Facebook message from "Medina Sinclair," contained allegations of racism and the threatening language: "I am finding every action that can be taken against this wrongful termination and discriminatory act to ensure my mom gets her job back; I will not stop! Heartless and evil!"

- December 2017: Facebook message from "Aus Riley." The message included the statement: "Feel dumb yet after firing minorities and using the excuse that they stole $1?!"

- December 2017: Facebook message from "Aus Riley." This message referenced a "tip policy" and "firing minorities" and "steal[ing] 1 dollar bills." It referred to Radak as an "Uneducated, racist prick."

When she returned home from visiting relatives over the Christmas holiday in 2017, Radak discovered a letter mailed to her home which contained the message: "you're not untouchable cunt. Karma will be waiting around the corner or you." This letter greatly upset Radak because it communicated to her that the sender knew where she lived, threatening her physical security.

The Facebook messaging continued:

- January 2018: Facebook message from "Aus Riley." "No safe space for racists." It also included profanity, an animated image of a little girl making a throat-slitting motion, and another image with the headline "BITCH DIE!"

- March 8, 2018: Facebook message from "Simone Wiley," which stated: "Think you were forgotten about. you're very easy to find petty bitch…remember that. We will get the last laugh." The message also referenced the specific housing community where Radak lived.

This evidence of these numerous threats against Radak and preceding the one charged in Count One, thus supporting the application of Section 2A6.1(b) for multiple threats as to Count One.

Further on this point, there is nothing in the Guidelines – or by operation of common sense -- that requires the Court to view each count in a vacuum and ignore the context of the threats.  In total, the defendant was charged with three different threats

23

communicated to six different people – eighteen threats in all. One of the threats – the slit your throat letter – was communicated separately to three different people: Gray, Pierce, and Wirthlin.  Thus, by any measure, the Section 2A6.1(b) enhancement applies.

**V.   At Least a 3-Level Upward Departure from Offense Level 24 Is Warranted Under Section 5K.0 of the Guidelines.**

The defendant's aggravated assault with a dangerous weapon on Wade Beavers justifies at least a 3-level upward departure under the Sentencing Guidelines to a Total Offense Level 27. USSG Sections 5K2.0 (a) (1)(A), (a)(2)(A) and (B). None of the specific characteristic adjustments discussed above, and otherwise applicable to the offense conduct, adequately addresses or takes into consideration that: a) the defendant otherwise used a dangerous weapon in the assault (USSG Section 1B1.1, Notes 1(E) and (J); USSG Policy Statement, Section 5K2.6); b) the defendant knowingly risked that a serious bodily with continuing pain would result from the assault (USSG Section 1B1.1, Note 1(M); USSG Policy Statement, Section 5K2.2), or that the victim has suffered and continues to suffer emotional pain (depression and anxiety) as a result. (Policy Statement, Section 5K2.3) *See* Victim Impact Statement of Wade Beavers submitted separately to the Court.

Nor do the specific characteristics applicable to the offense conduct adequately address the fact that the defendant, through counsel at trial, attempted to publicly humiliate a victim of her crime by falsely and slanderously accusing him, without any basis in fact, of sexually assaulting her. ECF No.s 184 and 242 at 59. The defendant, through counsel, specifically named the victim in front of the jury during opening statement, publicly accusing him of a criminal offense of sexual assault and then not asking a single question of him about it when he testified at trial and without otherwise adducing a scintilla of evidence

24

1   in support of it. ECF No. 242 at 156 (Cross-Examination of Wade Beavers). This can lead

2   only to the conclusion that these statements were designed only to humiliate her victims

3   even further with scandalous and scurrilous public accusations.

4        The defendant's proclivity to publicly accusing a victim of committing sexual

5   crimes and misconduct to humiliate extended also to the rants she filed on the public

6   docket before trial. ECF No. 54 (claims victim caused her to become pregnant). These

7   accusations further were not limited solely to victims only but extended to a law

8   enforcement officer investigating her case as well. ECF No's 52 and 55 (claiming LEO

9   sexually assaulted the defendant).

10        More recently, Mr. Beavers was yet again the object of a slanderous attack upon

11   his character made through an anonymous posting on a website hosted by Google. *See*

12   Exhibit 1. As shown in the exhibit, the posting bears all the earmarks of the scandalous

13   and scurrilous accusations made against Mr. Beavers at trial and in the defendant's *pro se*

14   rant filings on the public docket. The not-so-subtle similarities demonstrate that the

15   defendant personally, or through others, continues to attempt to gratuitously re-injure the

16   victims in her case.

17        Accordingly, for all the foregoing reasons, the government recommends an upward

18   departure of 3 levels from the Guidelines Total Offense Level 24 to Level 27. The

19   government further recommends that the Court sentence the defendant to 87 months'

20   imprisonment, the high end of that Guideline range. For the reasons stated herein, this

21   departure may be imposed as reasonable either as a departure from the Guidelines as

22   discussed above or as a so-called *Booker* variance under Section 3553(a) as discussed below

23   – or as both.

24   25

## VI.  87 Months' Imprisonment Is Consistent With and Reasonable Under the Title 18, United States Code, Section 3553(a) Factors.

Section 3553(a) requires the Court to impose a sentence "sufficient but not greater than necessary to comply" with the factors articulated in subparagraph 2 of Section 3553(a).  The government submits that the nature of the offense conduct and the characteristics of the offender, when combined with the need for the sentence to promote respect for the law, provide for a just punishment, and afford adequate deterrence to criminal conduct, so as to justify a sentence of 87 months' imprisonment.

### A.  The Nature and Circumstances of the Offense Conduct and the History and Characteristics of the Defendant.

As discussed above, the offense conduct is intentional and violent and resulted in significant injury to the victims. As the government urged at trial, this was not "one-off" conduct spawned in a fit of anger after provocation. It was, rather, recurring and plotting in nature, occurring over and over again: six victims, three letter, over a significant time span.

The victims did nothing to invite or provoke her threats. Yet, the threats continued and escalated. The Court should consider the following offense circumstances and characteristics, as already discussed above, when considering the reasonableness of the sentence under Section 3553.

- Escalating nature of the violence with no provocation.
- Six victims unrelated to the defendant with no antecedent history.
- Physical and emotional injury to the victims.
- Permanence of the harm to and continued victimization of Mr. Beavers.

26

**B.      To Promote Respect for the Law and Afford Adequate Deterrence to Criminal Conduct.**

In this regard, the Court should consider that fact that three (3) civil TPOs did nothing to deter the defendant from making criminal threats or criminally assaulting one of her victims.  Moreover, this defendant saw the criminal charges filed against her as an opportunity to continue to harass her victims and others through scurrilous, threatening, and scandalous pro se rant filings on the public docket. And the admonishment of this Court did nothing to deter her from continuing with her outrageous conduct.

Words, criminal charges, and court orders do nothing to deter this defendant from engaging in criminal activity. The safety and security for the victims in this case, and for the community at large, can only be assured through a lengthy period of imprisonment.

**VII.    Special Conditions of Supervised Release Are Appropriate and Reasonable.**

The government concurs with the PSR's recommended special terms and conditions for supervision and seeks further restrictions as follows.

**1.  No Contact Provision**.

The PSR recommends that the defendant have no communication or interaction with any of the victims in this case.  The government concurs in this recommendation and requests that the restriction be **expanded** to include the **names** of the victims for greater specificity, even though they are well-known to the defendant. The government also recommends that the restriction be **expanded** to include prohibiting not only personal interaction but also interaction involving the use of the internet or any public forum and that the interaction be expanded to include any communication **about** the victims as follows:

The defendant is prohibited from making, creating, or causing, any physical contact or personal interaction of any kind with any victim in this case. The defendant is also prohibited from using, or causing the use of, the internet or any public forum to, directly or through someone else, interact or communicate with or about, or to make any reference to or comment about, any victim, or family member of a victim, in any way, without prior approval from the Supervising Probation Officer. This prohibition extends to words, sounds, images, or signals used in any public forum or internet facility, to include any website hosted by the defendant or a third-party, or any social media accounts or facilities, to include without limitation, Twitter, Instagram, Facebook (Meta), Tik Tok, or YouTube.

As already shown, the defendant used Facebook to threaten Samantha Radak and the Court is well-familiar with the defendant's use of the district court's public electronic docket (CM/ECF) to slander others. Further, the recent activity against Mr. Beavers further demonstrates the use of the internet to hurt victims in this case. For all these reasons, the further restrictions are warranted.

**2.     Warrantless Search.**

Similarly, the same reasons discussed herein justify the warrantless search provision. The defendant used her computer and the internet to conduct her criminal activities. A warrantless search will assist in protecting the community against such future criminal activity.

**WHEREFORE**, for all the foregoing reasons, the government respectfully recommends that the Court adopt the facts set out herein, overrule the unresolved objections, find a Guideline Total Offense Level 24, depart upward 3 levels to a Total Offense Level 27, impose imprisonment for a period of 87 months' and find the sentence reasonable under Section 3553(a) of Title 18, United States Code.

**DATED** this 9th day of December 2021.

Respectfully submitted,

CHRISTOPHER CHIOU
Acting United States Attorney

/s/ *Steven W. Myhre*

_____
STEVEN W. MYHRE
Assistant United States Attorney
*Attorneys for the United States*

# EXHIBIT 1



# Fennemore Craig, P.C.

Website    Directions    Save

3.5 ★ ★ ★ ★ ★ 2 Google reviews

Legal services in Tucson, Arizona

**Located in:** Legacy Tax & Financial Services PLLC

**Address:** 1 S Church Ave Suite 1010, Tucson, AZ 85701

**Hours:** Closed · Opens 8AM Tue ▾

**Phone:** (520) 879-6800

Suggest an edit

**Know this place?** Share the latest info

## Questions & answers

Be the first to ask a question

Ask a question



IAm Ale
Nov 2019

# Wade ▮▮▮▮
# Big Sex Predator

Two words to describe him is a **SEX PREDATOR**. We want to inform EVERYONE that there is a big Sex Predator working for **FenneMore Craig Law Firm**. Wade ▮▮▮ thinks he can use his high ranking attorney skills to hide. One of my family members were sexual assualted by Wade ▮▮▮. Wade ▮▮▮ has also threatened to murder my family in the West & East Coast. We want to let every FBI Agency and every Law Enforcement personnel know that if anything happens to my family, please look for Wade ▮▮▮ the Sex Predator! Wade ▮▮▮ who uses his celebrity attorney, federal government friends and his dad who works for the State of Nevada to protect him. We will NOT stop until every news paper (east & west coast) & every social media platform knows about Wade ▮▮▮. People be aware! This is a person who uses their money and power to get away with sexual assaults. My family who was assaulted is a African American, young talented strong woman. Their racism needs to be Stopped and these people in high places need to be flashout and be exposed!